**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| JANE DOE, *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Case No.  2:15-cv-00257-DBH** |
| | ) | |
| BRUNSWICK SCHOOL | ) | |
| DEPARTMENT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**WITH INCORPORATED MEMORANDUM OF LAW**

**MOTION**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Brunswick

School Department ("BSD" or the "School Department") and Walter Wallace hereby move for

summary judgment in their favor on all counts of the Complaint.  The reason for this motion, as

set forth more fully below and in the accompanying statement of material facts, is that there is no

genuine issue of material fact, and Defendants are entitled to summary judgment as a matter of

law on all counts of the Complaint.

**MEMORANDUM OF LAW**

**INTRODUCTION**

In their Complaint in this case, Plaintiffs Jane Doe, individually and on behalf of her

minor son Jack Doe,  and the Maine Human Rights Commission (the "MHRC") have made a

series of broad and inflammatory allegations about what they claim occurred while Jack Doe was

at the Brunswick Junior High School ("BJHS") and how they claim the School Department and

BJHS Principal Walter Wallace addressed those issues in an attempt to state claims against the

Defendants under two federal laws,  42 U.S.C. § 1983 and Title IX of the Education

1

Amendments of 1972, 20 U.S.C. § 1688 *et seq.* ("Title IX").  Now that this case is at the summary judgment stage, Plaintiffs can no longer rely on rhetoric to keep their claims alive. Rather, their claims must be analyzed based upon facts in the record.  To be sure, those facts must be viewed in the light most favorable to the Plaintiffs and every factual dispute must be resolved in their favor, but even under this rigorous standard, Plaintiffs' claims must fail as a matter of law.  At best, this is a case where the Plaintiffs disagree with the School Department about how to address unkind behavior between students in middle school, not a case where the School Department and Walter Wallace discriminated against Jack Doe on the basis of his sex. The Defendants are therefore entitled to judgment as a matter of law on all counts of the Complaint.

## STATEMENT OF FACTS[1]

The Brunswick Junior High School ("BJHS") provides a free public education to approximately 500 students from a variety of socio-economic backgrounds in and around Brunswick Maine.  SMF ¶ 1.  Under the leadership of its Principal, Walter Wallace, BJHS has earned a reputation around the state as being a school with a strong anti-bullying culture, SMF ¶ 30, a reputation that is both well-deserved and hard earned.

The undisputed record establishes that Walter Wallace has been at the forefront of the school's efforts to combat bullying, harassment and all kinds of unkind behavior by students at the school.  Before he took over as Principal of BJHS in August, 2009, Mr. Wallace began to do extensive studying on bullying and bullying prevention.  SMF ¶ 5.  As part of that research, he learned that the foundation of bullying prevention is a safe and affirming school climate, marked by consequences for aggression, positive feedback for students, and strong student/adult relationships. SMF ¶ 7.   He also learned that the most effective bullying prevention involves a

---

[1] Defendants' Statement of Material Facts Not In Dispute ("SMF") is incorporated by reference in its entirety herein.

three pronged approach for intervention: (1) help for aggressive youth to change; (2) support for targets; and (3) empowerment of bystanders.  SMF ¶ 8.  Mr. Wallace set about to put such a program into place at BJHS almost as soon as he started as Principal there.  He surveyed the school to understand the environment and  he put together an Anti-Bullying Committee to develop a program tailored specifically to BJHS and ultimately led that committee to adopt a rubric for dealing with bullying.  SMF ¶¶ 9, 11.  Mr. Wallace also spearheaded other steps to combat bullying at BJHS, including working hard to build connections between students and adults in the school by, *inter alia,* creating Advisor/Advisee groups consisting of an adult and a small group of students who meet together on a daily basis, strengthening students' feeling of connection with the school and working to eliminate ostracism by offering a variety of afterschool programs so that every student has a niche and no student is considered "uncool," and infusing the school with a culture opposed to bullying, through frequent assemblies, posters educating students that bullying is not tolerated, and classroom discussions.  SMF ¶¶ 20-27.

Unfortunately, notwithstanding all of the good work of the administration and staff, some bullying does occur at BJHS just as it does in schools across Maine and across the country.  And when it occurs, the administration and staff at BJHS work to respond swiftly and effectively – with the ultimate goal being to keep all children safe and secure and to teach students how to interact appropriately in this world.   They attempt to deal with incidents fairly and to treat all students equally and with respect.  SMF ¶ 34.  They use a variety of strategies from talking to students about their behavior to imposing discipline, from providing counselling to both aggressor and victim, to involving parents and family.  SMF ¶¶ 14-30, 35, 105, 127.

The minor Plaintiff in this case, Jack Doe, entered BJHS in the fall of 2010, just a year after Mr. Wallace took over as Principal in the school and at a time when administration and staff were in the process of looking at how better to address bullying in the school.  SMF ¶ 42.  Jack is

overweight and prior to starting school at BJHS, he had been teased about his weight.  SMF ¶¶ 39, 47.  He was also struggling with issues caused by the divorce of his parents and his relationship with his father.  SMF ¶ 38.  Whether because of this history or something else, without question, Jack is a sensitive child who is quick to label conduct he does not like as "bullying."  Thus for example, when his Language Arts teacher called him by his given name rather than his nickname during the first day of school, Jack considered that to be bullying.  SMF ¶¶ 45-46.

Jack Doe struggled in 6th grade at BJHS.  Some of Jack's problems were academic.  According to Jack, the work in junior high was harder than it had been in elementary school and so he struggled a lot more there.  SMF ¶ 44.  In fact, of the three meetings that his parents had with Jack's teaching team,[2] two of them focused exclusively on academic issues he was having particularly in Language Arts.  SMF ¶ 47, 50.  Teachers were reporting that Jack was not doing the work assigned, while Jack's mother claimed that Jack was not being adequately supported.  SMF ¶ 50.

While in 6th grade, there were instances when Jack felt that his peers were "bullying" him,[3] some of which he claims he reported to adults in the school and some of which he did not.[4]  The specific incidents that Plaintiffs claimed occurred and were reported are as follows:

- Jack claims that he was cornered at his locker 5-6 times by different groups of peers and teased because of his weight, how he acted, and the kind of music he listened to.  SMF ¶¶ 52, 54.  This lasted 2-3 minutes.  SMF ¶ 53.  Jack claims he reported one of the

---

[2] Students at BJHS are organized into groups taught by a team of four teachers (Language Arts, Math, Science and Social Studies).  These teachers meet every other day to discuss the students on their team and they correspond and meet frequently with parents.  SMF ¶ 43.

[3] According to Jack, he is homophobic and he was thus particularly sensitive to anything comments concerning sexual orientation. SMF ¶ 41.

[4] By far the most serious allegations Jack has made are his claims that he was raped three times in three different bathrooms by at least two and maybe three different groups of boys while in 7th grade.  Jack concedes that he did not report any of these alleged incidents to anyone until October of the following school year when he had already decided never to return to BJHS. SMF ¶ 197.

incidents to his homeroom teacher, SMF ¶ 58, but admits that he did not report other similar incidents to anyone.  SMF ¶¶ 53, 57.

- When Jack was sitting near a window in class, he felt that a fellow student was staring at him for an unreasonable amount of time.  Jack testified that he believes he may have reported this to his guidance counselor.  SMF ¶¶ 60-63.

- A student in his science class asked Jack if he would be interested in mating with him. Jack declined the invitation and reported what had occurred to his science teacher, Mr. Higgins.  Mr. Higgins spoke to both boys individually, allowed Jack to move his seat, and this student never engaged in similar conduct again.  SMF ¶¶ 65-66, 68.

- A student brought some cheese to a party in French class.  After Jack had eaten some of the cheese, the student said he had been up all night licking it and thinking of Jack.  Jack tried not to associate with this student so he did not want the student to talk to him and he thought it was "creepy" that someone enjoyed thinking about him.  He also did not like that the student had licked cheese he brought to share with the group.  Jack claims he reported this to his French teacher who separated the two students.  SMF ¶¶ 69-74.

- A student asked Jack if he wanted to play the "fire truck game."  When Jack asked what that was, the student put his hand on Jack's side and started moving it down Jack's leg. Jack told him to stop and the student said "fire trucks don't stop at red lights."  Jack claims he reported this incident, which took 6-7 seconds, to his teacher and that it never happened again.  SMF ¶¶112-116.

- Various students played a game that Jack has called the "gay test" on Jack over the course of some period beginning a few weeks after school started.  This game involved someone putting his hand on the shoulder of the person being tested and seeing if that person knocked it off within a certain amount of time.  SMF ¶ 78.   According to Jack, this game was performed on a number of students at BJHS, not just Jack.  SMF ¶ 81. Jack characterized this game to the Brunswick Police Department as "typical junior high boy stuff," and further told them that he was not bothered again by the boys who did it. SMF ¶ 88.  Jack claims he reported the test to two teachers and to Mr. Wallace. SMF ¶¶ 79, 80, 85-86.   Jack's mother reported the test to Mr. Wallace, who spoke to the boys that were reported to have been involved, reached out to the parents and spoke with one, and never heard about it again from the Does.  SMF ¶¶ 94, 103-05.

In addition to the incidents that Plaintiffs recalled, the BSD has records reflecting that

Jack had reported that he overheard a student saying Jack was a "scaredy cat" while Jack was

hiding on the other side of a book shelf, that a student had moved closer and closer to Jack in his

social studies class, and that a student had said, "Hi, [Jack]" to him in a high voice which made

him feel uncomfortable.  SMF ¶ 119.  These issues were addressed by Jack's social studies

teacher who reported to Mr. Wallace that she spoke with the students and moved them into different groups.  SMF ¶ 121.

Nor was Jack always the victim.  He was disciplined when he was in 6th grade for making anti-Semitic remarks about fellow classmates.  SMF ¶ 128.  At his deposition, Jack explained that he did not like any of the Jewish people at the school and "it was just a category for me to – to – for me to use to describe some people that I did not like."  SMF ¶ 129.  He admitted, however, that his statement "was definitely a lapse in judgment on my part."  SMF ¶ 130.   In addition, the mother of one of Jack's classmates reported to a teacher that Jack referred to her son as that "bald gay kid."  SMF ¶ 107.

The year that Jack started 7th grade was the year that BJHS, under the direction of Mr. Wallace and the Anti-Bullying Committee, rolled out a new tool to address bullying at the school which it called the Peer to Peer Rubric.  SMF ¶ 16.  The Peer-to-Peer Rubric is an online tool that provides for predictable escalating consequences for unacceptable behavior and allows staff easy access to data relating to a student's history with bullying events.  In the common parlance of BJHS, to be put "on" the rubric means to have the student's name entered into the data base with consequences imposed consistent with the rubric.

Jack's 7th grade year involved three types of incidents:  (1) incidents where Jack was the victim of inappropriate interactions with peers; (2) incidents where Jack claimed to have been subjected to bullying behavior but after investigation, the school determined that Jack's reports were inaccurate; and (3) incidents where Jack was the perpetrator of inappropriate interactions with his peers.

There were eight incidents in the first category.  First, Jack was poked with a pencil in social studies class and claims he reported this to Mr. Wallace after class.  SMF ¶ 136.  Second Jack was poked with a pushpin by another student who said he did it to see if Jack would deflate.

6

Jack reported this to a teacher who spoke to the student and it never happened again.  SMF ¶¶ 137-39.  Third, Jack complained to Ms. Acheson that two male students said "I love you" to him and kept saying "Hi [Jack]."  SMF ¶ 158.  Jack's guidance counselor, Ms. Andrews, investigated the incident and was told by the two boys that Jack had called them "gay" before they teased him.  SMF ¶ 159.  Fourth, Jack claims that a student rubbed his sides and back while he was at the water fountain.  SMF ¶ 144.  Fifth, Jack complained to his guidance counselor that a student poked him in the chest and said he had "man boobs."  The guidance counselor spoke with the boy who made the comment and it was never repeated.  SMF ¶ 147.  Sixth, a teacher overheard a student in the hall make a comment to the effect that Jack had "man boobs."  The teacher immediately addressed the issue, the student apologized, Jack accepted the apology and appeared satisfied with the say the situation was dealt with.  SMF ¶¶ 150-51.  Seventh, in May, Mrs. Doe reported that students had been making jokes about Jack having "man boobs."  Mr. Wallace investigated the incident and learned that there had been students in the gym as part of a special education program.  Jack was also in the gym and someone had made a comment about "man boobs."  The student making the comment received consequences because they had intended to be unkind.  SMF ¶¶ 166-67.  Finally, Jack reported that a student called him "Cheese and he did not like it.  Mr. Wallace spoke with the student who apologized.  Mr. Wallace told the student not to call people names they do not like and recorded the incident on the Peer to Peer Rubric.  SMF ¶ 168.

There were four incidents in the category of complaints made by Jack that turned out to be demonstrably false or grossly exaggerated.  First, on December 12, 2011, Jack complained that another student ran over his arm with a skateboard in gym class.  He complained about this incident to his advisor but when she investigated, she discovered that it is not physically possible for someone to run over an arm with a skateboard and that Jack made the complaint after he had

been disciplined in gym class.  SMF ¶¶ 142-43.  Second, Jack claimed that he was forced into the corner in the stairwell.[5]  Surveillance video of the incident revealed, however, that this did not occur.  SMF ¶¶ 172-75.  Third, Jack claimed that he was hit on the head with a lacrosse stick.  Surveillance video of that event revealed that although a student did poke Jack with a lacrosse stick in greeting, he did not hit Jack over the head.  The student was put on the Peer to Peer Rubric for the unwanted touch.  SMF ¶ 152-57.   Fourth, Jack claimed that two 8th grade students called him a "douche bag" as they walked by him in the hall.  Video surveillance tape revealed that there was no communications between Jack and the two boys he accused. SMF ¶ 169.

Finally, the third category, incidents where Jack was the aggressor, includes four incidents that are notably similar to the incidents in which Jack was the victim, *i.e.,* incidents where one  middle school student  used, to use Jack's own words, "poor judgment" in his interactions with another middle school student: (1) Jack drew a picture of a friend he was mad at being electrocuted; (2) Jack called a male classmate "gay;" (3) Jack referred to a male classmate as a girl; and (4) Jack called a classmate an "ass."  Jack was put on the Peer to Peer Rubric for this conduct in the same way that those who had directed similar conduct to him had. SMF ¶ 181.

By the end of Jack's 7th grade year at BJHS, although staff at the school knew that some of what Jack was reporting was not accurate, it nonetheless worked to address the feelings expressed by Jack and his mother that Jack felt unsafe at BJHS by creating a safety plan for him that would provide him with additional adult supervision and would allow Jack to transition to different classes before or after the general student body so that he would feel more secure.  SMF

---

[5] Jack also testified in deposition that while this was occurring, students were making fun of his weight and saying he was gay.  He concedes he did not mention this when he reported the alleged incident.  SMF ¶¶ 173-74.

¶ 176.  Jack did not like the plan that was created for him so he told the guidance counselor that he wanted it to stop and it did.  SMF ¶¶ 177-80.

When Jack returned to BJHS for 8th grade, the only names he recalls people calling him are "fat" and "idiot," and Jack did not tell any adult at the school about this.  SMF ¶ 182.  Jack did complain that a female student said something unkind to him in Sustained Silent Reading ("SSR").  Ms. Cushman spoke to the student and she was given consequences on the Peer to Peer Rubric.  SMF ¶¶ 185-86.   Jack also complained that a student sat on his lap and this incident was investigated by Mr. Wallace.    What Mr. Wallace learned is that a group of boys were fooling around, changing seats and playing staring games.  He was told that although Jack sometimes joined in the game, he sometimes got upset about it.  Mr. Wallace thus addressed the issue with the student who was involved with Jack and put him on the Peer to Peer Rubric. SMF ¶ 187.  Mr. Wallace also met with two female students who Jack reported had made comments about his weight, hair, and technology club.  Mr. Wallace gave the students involved consequences on the Peer to Peer Rubric.  SMF ¶ 188.   Finally, Mr. Wallace met with a student who Jack reported had been unkind on Facebook.  The student involved was given consequences on the Peer to Peer Rubric.  SMF ¶ 189.

After Jack stopped coming to school in October 2012, the school set up a meeting with Jack and his mother to discuss the situation.  Jack refused to attend the meeting.  SMF ¶ 193. When Jane Doe returned from BJHS and told Jack that he needed to attend, he told her for the first time that he had been sexually assaulted three times by three different groups in three different places when he was in 7th grade.  SMF ¶¶ 194, 197, 205.  At the time Jack made these allegations, he was determined never to return to BJHS, his mother had decided he would never return, and he never did.  SMF ¶ ¶ 195-98.  Instead, the BSD provided tutoring for Jack until the end of the semester when he was transferred to another district.  SMF ¶ 203.

## LEGAL STANDARD

Summary judgment is appropriate where the record indicates that there is no genuine issue of material fact.  Fed. R.Civ.P. 56(c); *Fabiano v. Hopkins*, 352 F.3d 447, 452 (1st Cir. 2003) ("Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.").  A "material fact" is a fact that has the potential to change the outcome of the case, and "genuine" "means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party." *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995) (internal citation omitted). The facts are viewed in the light most favorable to the nonmoving party, and once the moving party has made a preliminary showing, the burden shifts to the nonmovant to "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Ralar Distributors, Inc.*, 4 F.3d 62, 67 (1st Cir. 1993).

## ARGUMENT

In their Complaint in this case, Plaintiffs claim that Jack Doe was subjected to sexual harassment by his peers at BJHS and seek to hold the Defendants liable under three theories. Count I, alleged against both BSD and Walter Wallace individually, is a claim asserted under 42 U.S.C. § 1983 for alleged violation of the Doe Plaintiffs' rights under the Equal Protection Clause and First Amendment of the United States Constitution; Count II is a claim alleged only against the School Department for violation of Title IX; and Count III is a claim also alleged

only against the BSD for violation of the Maine Human Rights Act (the "MHRA").[6] Because

this case is, at its core, based on the Defendants' reaction to alleged sexual harassment of Jack

Doe by his peers, Defendants begin their discussion with the Title IX claim.

## I. THE BRUNSWICK SCHOOL DEPARTMENT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' TITLE IX CLAIM

Title IX is a federal funding statute which provides that "no person in the United States

shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under any education program of activity receiving federal financial

assistance."  "Title IX was not intended and does not function to protect students from bullying

generally (as opposed to sexual harassment or gender discrimination) or to provide them

recourse for mistreatment that is not based on sex." *Brodsky v. Trumbull Bd. of Educ.*, 2009 WL

230708, at *7 (D. Conn. Jan. 30, 2009).

In *Davis v. Monroe County Bd. Of Educ.*, the United States Supreme Court held that a

student could recover damages against a federally-funded school for peer-to-peer harassment

under Title IX only in "certain limited circumstances." 526 U.S. 629, 643 (1999).  Specifically,

the plaintiff must show (1) the school had actual knowledge of the harassment, (2) the harasser

was under the school's control, (3) the harassment was undertaken on the basis of sex, (4) the

harassment was "so severe, pervasive, and objectively offensive that it effectively bar[red] the

victim's access to an educational opportunity or benefit," and (5) the school was deliberately

indifferent to the harassment.  *Id.* at 633, 643, 650.  In this case, Plaintiffs allege that Jack was

subjected to two kinds of harassment while at BJHS:  (1) unkind treatment by his peers in 6th

grade, 7th grade, and the beginning of 8th grade; and (2) three sexual assaults allegedly

---

[6] The standard for analyzing the Title IX and MHRA claims is identical.  *See Maine Human Rights Commission v. City of Auburn,* 408 A.2d 1253, 1261 (Me. 1979) (Maine courts "look to federal case law to provide significant guidance in the construction of [the MHRA]."); *Helwig v. Intercoast Career Inst.*, 2012 WL 1521474 (Me. Super. Feb. 9, 2012) (applying same standard to federal Title IX claim and claim under the MHRA).

perpetrated on him by three different groups of boys during his 7th grade year at BJHS.  These

two categories are discussed separately below.

### A.  Unkind Behavior

#### 1.  There Is No Evidence That Jack Was Subject To Severe and Pervasive Harassment On The Basis Of Sex

"Discrimination on the basis of sex is the sine qua non of a Title IX sexual harassment

case . . . ."  *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 66 (1st Cir. 2002).  "In the context of

a Title IX sexual-harassment claim, the plaintiff must always prove that the conduct at issue was

not merely tinged with offensive sexual connotations, but in fact constituted discrimination

'because ... of sex.'"  *Hankey v. Town of Concord-Carlisle*, 136 F. Supp. 3d 52, 66 (D. Mass.

2015) (citing *Frazier,* 276 F.3d at 66) (internal quotation marks omitted, alterations in original).

Bullying that is not on the basis of sex is not actionable under Title IX.  *Frazier*, 276 F.3d at 67.

Nor is harassment based on one's sexual orientation.  *Higgins v. New Balance Athletic Shoe,

Inc.*, 194 F.3d 252, 259 (1st Cir. 1999); *Hoffman v. Saginaw Public Schools*, 2012 WL 2450805,

at *8, *12 (E.D. Mich. June 27, 2012) (citing *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1085

(7th Cir. 2000)).

As the Supreme Court has noted, with children, proving that harassment was actually "on

the basis of sex" is difficult because children "regularly interact in a manner that would be

unacceptable among adults," leading some students to "engage in insults, banter, teasing,

shoving, pushing and gender-specific conduct that is upsetting to the student subjected to it."

*Davis*, 526 U.S. at 651-52; *see also Hill v. Cundiff,* 797 F.3d 948, 969 (11th Cir. 2015)

("Due to their immaturity, children at various ages will invariably engage in some forms of

teasing, shoving, and name-calling that 'target differences in gender.'  Some risk of sexual

harassment is inherent to the enterprise of public education, in particular, because public schools

must educate even the most troublesome and defiant students.") (internal citation omitted).

Thus, courts have held that "gender-based" insults or insults based on sexual orientation are not alone violations of Title IX because they are not "based on sex."  For example, the First Circuit recently granted a defendant's motion to dismiss a Title IX claim, finding that as a matter of law, a male student who alleged he was beaten, had his pants pulled down in front of girls, was called "thunder thighs" and "hungry hippo" had provided no evidence that the behavior occurred "because of sex," or that the school's response was inadequate "because of sex."  *Morgan v. Town of Lexington*, 138 F. Supp. 3d 82, 95 (D. Mass. 2015), *aff'd sub nom. Morgan v. Town of Lexington,* 823 F.3d 737 (1st Cir. 2016).[7]

Some of the incidents alleged by Jack are clearly not protected under Title IX, including his claims that a fellow student stared at him too long or said "hi," his report that he was teased because of his weight and his taste in music, and his complaints about being poked with a pencil and a push pin and nudged with a lacrosse stick.  Plaintiffs, however, point to two games played by Jack's fellow students, the "gay test" and the "fire truck game," and claim that rather than being typical middle school horseplay, these games are examples of sexual harassment.

Case law establishes that Title IX does not support claims based on sexual orientation alone, and the simple fact that Jack may have been called "gay" does not by itself give rise to Title IX claim.  In *Wolfe v. Fayetteville,* a student was repeatedly called names including "gender-based epithets such as 'faggot,' 'queer bait,' and 'homo,'" and a Facebook group was created for those who disliked Wolfe, which included a picture of Wolfe "photo-shopped onto a

---

[7] *See also, e.g., HB v. Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 4477552, at *17 (S.D.N.Y. Sept. 27, 2012) (finding that student—who was called names such as "whore" and "bitch," as well as "fucking rat," "dirty spic," and "gorilla," and "was physically assaulted in a non-gender-specific way" did not plausibly plead that she was harassed *because of* her gender); *Brodsky,* 2009 WL 230708, at *1 (name-calling such as "lesbian," "ugly skank," and other sexually charged names was not "based on sex;" rather the name-calling stemmed from general hostility between students).

figure in a green fairy costume with the word 'HOMOSEXUAL' written across it."  648 F.3d

860, 862 (8th Cir. 2011).  Despite these incidents, the court held that there was insufficient

evidence to conclude that discrimination occurred "because of sex."  Similarly, in *Preston v.*

*Hilton Cent. School Dist.,* a student asserted a Title IX claim after repeatedly being called names

such as "gay," "faggot," "piece of shit," and "bitch."  876 F. Supp. 2d 235, 243-44 (W.D.N.Y.

2012). The court held that such insults were again "insufficient" to show that the alleged

harassment was based on gender.  *Id.*  And more recently, in *Doe v. Torrington Bd. of Educ.*, the

Court held that the terms "fat ass" and "baby," are not associated with gender, and the terms

"pussy," "faggot," and "bitch" were insufficient to suggest that a student was harassed on the

basis of gender.  2016 WL 1257819, at *12 (D. Conn. Mar. 30, 2016).

    In order to generate a triable issue in this case based on these games,  Plaintiffs must

prove that the alleged harassers acted with some type of "sex-based" motivation, and produce

some plausible evidence that students performed the so-called "gay test" game or the "fire truck

game" (which only occurred once) on Jack because he was male, or not male enough.  *See Wolfe,*

648 F.3d at 865, 867 (plaintiffs' burden to present admissible records evidence of "underlying

intent, and therefore motivation, on the part of the actor to discriminate because of one's sex or

gender").  But there is none.  There is no evidence that Jack is gay or that any students actually

thought Jack was gay, and there is no evidence that Jack was teased because of his gender or his

failure to conform to stereotypical male characteristics.  *Id.* at 867.  To the contrary, the record

establishes − and Jack admits − that the so-called gay test game was administered to 6 or 7 other

students in addition to Jack, that it was "typical" junior high school activity, and that after Jack

brushed the student's hand away, the game stopped.  SMF ¶¶ 81, 88.  Indeed, while he was at

BJHS, Jack himself referred to classmates as "gay." SMF ¶¶ 107, 149, 181.

    Next, Plaintiffs point to the comments made to Jack that he had "man boobs" as evidence

of sexual harassment, presumably because of the word "boobs" can have sexual connotations in certain contexts.  But again, there is no record evidence that these isolated comments were made on the basis of Jack's sex.  *See Hoffman,* 2012 WL 2450805, at *11 ("Although this conduct indisputably has sexual connotations, the complaint offers no facts suggesting that D.K. acted because of M.M.'s sex. The complaint does not allege facts suggesting that M.M. behaved effeminately or effetely. The complaint does not allege that D.K. (or any other person, for that matter) indicated a belief that M.M. exhibited effeminate or effete characteristics.").  Instead, the only evidence in the record relating to these incidents indicates that those comments were directed, if anything, towards Jack's weight.  That is how Mr. Wallace construed the comments, SMF ¶ 167, and at least one court addressing the same "man boob" teasing previously determined that the comment referred to weight, not sex.  *See Patterson v. Hudson Area Sch.*, 724 F. Supp. 2d 682, 691 (E.D. Mich. 2010) ("man-boobs" comment referred to weight and was not based on sex).  And unkind behavior directed at weight is not prohibited under Title IX. Thus, the First Circuit recently dismissed a Title IX claim based on similar allegations that a student was called "thunder thighs," finding that there were no allegations that the teasing occurred because of the student's sex.  *Morgan*, 138 F. Supp. 3d at 95; *see also Davis,* 526 U.S. at 652 (comparisons between sexual harassment and teasing of an overweight child are "inapposite and misleading").

Finally, Plaintiffs are left with a handful of incidents – two during Jack's 6th grade year and two during his 7th grade year – where a student said he loved Jack, was thinking about him,[8] or wanted to mate with him.  Whether those comments were made because of Jack's sex or simply because the perpetrators knew they would bother Jack is not clear and Plaintiffs are

---

[8] Plaintiffs' attempt to turn the student's comments about licking cheese into a sexual comment is nonsensical.  As Jack himself recognized, this was the typical sense of humor of a middle school male claiming that he licked food before others ate it. SMF ¶ 72.

simply unable to prove that they were made because Jack is a male.

Even if the Court were to determine that one or more of the incidents alleged by Jack was perpetrated against him on the basis of sex, Plaintiffs' Title IX claims must still fail as a matter of law.  The Supreme Court has made clear that in order to maintain a claim under Title IX, a Plaintiff must provide evidence that the harassment based on gender was "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities." *Davis*, 526 U.S. at 651.  Leaving aside the fact that, as discussed above, there is no evidence that Jack was harassed on the basis of his sex, the few isolated potentially gender-based epithets identified in his complaint were not severe and pervasive. *Hankey*, 136 F. Supp. 3d at 67 (finding that harasser's use of gender based term on one occasion could not transform other alleged incidents of harassment into being based on gender); *see also Vidovic v. Mentor City Sch. Dist.*, 921 F. Supp. 2d 775, 797–98 (N.D. Ohio 2013) (other acts not motivated by gender could not be used to show that harassment based on sex was severe and pervasive).

### 2.    There Is No Record Evidence That the School Department Was Deliberately Indifferent to Known Harassment On The Basis Of Sex

A public school may only be liable for potential damages under Title IX if "its deliberate indifference [to peer-on-peer sexual harassment] 'subjects' its students to harassment." *Porto v. Town of Tewksbury*, 488 F.3d 67, 72 (1st Cir. 2007) (citing *Davis*, 526 U.S. at 644 (alterations in original)). The acts of sexual harassment must be "known" to the school.  *Id.; Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (acts must be known to administrator with actual authority to take corrective action).  Courts have made clear that deliberate indifference is a "high bar, and neither negligence nor mere unreasonableness is enough."  *Sanches v.*

16

*Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 168 (5th Cir. 2011).  Furthermore, schools are "not required to remedy the harassment or accede to a parent's remedial demands and 'courts should refrain from second-guessing the disciplinary decisions made by school administrators.'" *Id.* (quoting *Davis,* 526 U.S. at 648).  "[A] claim that the school system could or should have done more is insufficient to establish deliberate indifference."  *Porto*, 488 F.3d at 73 (rejecting parents' assertion that school should have "done more" and granting motion for directed verdict on Title IX claim).

A school need not stop the alleged harassment or apply a specific gold standard in responding to known allegations of peer-to-peer sexual harassment.  In *Porto v. Town of Tewksbury*, parents of a middle school student alleged that a school should have done more to prevent a student from sexually harassing their son, and that an incident of sexual assault should have been foreseeable based on the past history of the two students.  The First Circuit flatly rejected this argument, making clear that "the fact that measures designed to stop harassment prove later to be ineffective does not establish that the steps taken were clearly unreasonable in light of the circumstances known by [the school] at the time.  The test for whether a school should be liable under Title IX for student-on-student harassment is not one of effectiveness by hindsight." *Id.* at 74.  The Court reversed the district court and entered judgment in favor of the schools, finding that there was no evidence that the school knew or that it was obvious that the peer would continue to sexually harass the student.  *Id.* at 75.

Similarly, in *Vidovic v. Mentor City Sch. Dist.*, 921 F. Supp. 2d 775 (N.D. Ohio 2013), a high school student was bullied by fellow students.  She discussed the matter with her guidance counselor, who facilitated meetings between her and other students.  When the student returned form a leave of absence, the school monitored her, encouraged her to see her counselor whenever necessary, and made sure that her teachers were aware of the issues. Vidovic eventually

17

withdrew from the school, and shortly thereafter she committed suicide. The court found that no reasonable jury could find that the school, which took numerous measures in response to Vidovic's bullying complaint, could be found to be deliberately indifferent, and further that there was no evidence that the school was aware of any harassment that could have been found to be sexual in nature. *Id.* at 798.

Nor does the fact that a school determines that some complaints of bullying did not occur generate a factual issue.  Thus, in *Stiles v. Grainger Cty*, 819 F.3d 834 (6th Cir. 2016), a middle school student, DS, alleged that he was bullied and sexually harassed by other students.  He was the victim of sexually charged insults, and routinely pushed.  DS reported some, but not all of these incidents to the school. The school responded to some of the complaints, but determined that DS was not bullied, but rather "[gave] as good as he got."  The Sixth Circuit affirmed the district court's finding that a reasonable jury could not find that the school was deliberately indifferent because each time the school was faced with a complaint, it responded in some way to the complaint, and those responses varied depending on the nature of the complaint.  *Id.* at 851; *see also id.* at 849 (noting that "courts should not second-guess school officials' disciplinary judgments").

In this case, it is undisputed that BSD had a Board policy prohibiting discrimination on the basis of sex and that BJHS had rigorous procedures in place to address bullying.  It is also undisputed that school personnel took steps in virtually every act of alleged bullying that was reported to them.  In almost all cases, those steps stopped the bullying by that student, and the Does acknowledged that the issues with those students were resolved.  It is true that sometimes rather than resorting to punishment, teachers and administrators chose education – talking to the students involved and explaining why what they were doing was unacceptable.  Plaintiffs may disagree with this approach but they cannot contend that it was deliberately indifferent.  The

18

School Department is therefore entitled to summary judgment on the Title IX and MHRA claims.

### B.    Sexual Assaults

In October, 2012, after Jack had started 8th grade at BJHS, he told his mother and then the School Department and the Brunswick Police Department that when he was in 7th grade, he was sexually assaulted three times by three different groups of boys in three different locations.  SMF ¶ 202.  Undeniably, these are allegations of severe and pervasive sexual harassment and undeniably, they raise issues of disputed fact.  Jack persists in claiming the events occurred while the School Department (and the Brunswick Police Department) determined that Jack's allegations were unfounded.  SMF ¶¶ 204-205.  This dispute of fact, however, is not *material* for the purposes of this summary judgment motion.  As discussed above, the Supreme Court has made clear that there can be no action under Title IX "unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has <u>actual knowledge</u> of discrimination in the recipient's programs and fails adequately to respond."  *Gebser,* 524 U.S. at 290 (emphasis added); *see also Martin v. Swartz Creek Cmty. Sch.,* 419 F. Supp. 2d 967, 974 (E.D. Mich. 2006) (granting district's motion for summary judgment in part, holding that absent evidence of actual knowledge, unreported incidents could not support plaintiff's Title IX claim).  Here, the undisputed record establishes that Jack did not make these allegations until the school year following when they allegedly occurred, SMF ¶¶ 194, 197, that by that time, both he and his mother had decided that he would never return to BJHS, SMF ¶ ¶ 195-96, and that he never did return, SMF ¶203.  The alleged sexual assaults thus cannot support Jack's Title IX claim and the fact that whether or not they occurred is disputed is not material.

## II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE EQUAL PROTECTION CLAIM

### A.  Walter Wallace

Plaintiffs' equal protection claim against Walter Wallace appears to be founded on two different theories: First, Plaintiffs claim that Mr. Wallace violated Jack Doe's equal protection rights because he and the School Department had  a "custom" of treating harassment against girls more seriously than harassment against boys, *see* Plaintiffs' Answer to Interrogatory #9, and second , Plaintiffs claim that liability under the equal protection clause arises as a result of Mr. Wallace's alleged "inadequate response"  to peer-to-peer sexual harassment.  *Id.*

As to Plaintiffs' first theory, there is absolutely no evidence in this record to support Plaintiffs' claim that Mr. Wallace treats girls and boys differently.  The only thing that Plaintiffs have pointed to is a disputed statement that Jack's father claims Mr. Wallace made to him about middle school boys being like a wolf pack.  Even if Mr. Wallace had made this comment, however, it would be insufficient to support an equal protection claim.  *See Seamons v. Snow*, 84 F.3d 1226 (10th Cir. 1996) (administration response of "boys will be boys" to claims that male student was humiliated by teammates was not harassment on the basis of sex).  To the contrary, both Mr. Wallace's own sworn testimony and the school's Peer to Peer Rubric establish that the school attempts to address conduct in the same manner whether the alleged aggressor is male or female.  SMF ¶¶ 17, 34.  Mr. Wallace is thus entitled to summary judgment on this portion of the equal protection claim.

The second theory underpinning Plaintiffs' equal protection claim is in essence a claim that Mr. Wallace violated Title IX.  "[A] governmental official . . . may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment."  *Murrell v. Sch. Dist. No. 1, Denver, Colo.,* 186 F.3d 1238, 1250 (10th Cir. 1999).  In order to prevail on a

claim of deliberate indifference to sexual harassment, a plaintiff must prove the individual defendant "actually knew of and acquiesced in" the discriminatory conduct. *Id.* at 1250 (quotation omitted). "Qualified immunity, however, offers complete protection for individual government officials performing discretionary functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hill v. Cundiff*, 797 F.3d 948, 978 (11th Cir. 2015) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  The issue of whether a government official is entitled to qualified immunity is a legal question to be decided "at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  This is an issue this Court should therefore decide at the summary judgment stage of this litigation.

As discussed above, BSD did not violate Title IX in the way it addressed complaints of bullying by Jack Doe and his family and therefore the claim against Mr. Wallace must fail. However, even if the Court determines that there are issues of fact precluding summary judgment on the Title IX claim – which there are not – Mr. Wallace is still entitled to summary judgment on Count II.

Because this is a claim alleged against Walter Wallace in his individual capacity, analysis of Plaintiffs' equal protection claim must begin by looking only at those instances of alleged bullying and harassment that Walter Wallace knew about.  The summary judgment record contains only a handful of incidents that Mr. Wallace was aware of.  For Jack's 6th grade year, Jack and his mother told Mr. Wallace about the "gay test," and told him generally that people were making gay slurs at Jack.  Around the same time, Mr. Wallace was also informed that a student may have called Jack "scaredy cat," that a student had moved closer and closer to Jack in Ms. Arzate's class, and that a student had said, "Hi, [Jack]" in a high voice which made Jack feel uncomfortable.  Mr. Wallace was also told that students were laughing at Jack at lunch.  Jack

also testified that he possibly told Mr. Wallace about the comment made in Mr. Higgins' class when someone asked to mate with Jack. All of these alleged communications occurred in about late January and early February 2011, and upon receiving information about the same, Mr. Wallace (and staff) addressed the issues and spoke with the students involved and never heard that the activity persisted after that. In addition, Mr. Wallace arranged for additional support in social skills for Jack. There is no evidence that any of the other incidents Plaintiffs allege occurred while Jack was in 6th grade were communicated to Mr. Wallace.

In Jack's 7th grade year, Plaintiffs claim to have informed Mr. Wallace of the following:

- That Jack was poked with a pencil;

- That Jack was poked with a pushpin to see if he would deflate;

- That a student sat on Jack's lap;

- That a student rubbed Jack's back while he was at the water fountain;

- That Jack was poked with a lacrosse stick;

- That two 8th grade students called Jack a "douche bag."

Finally, Jack's 8th grade year, Mr. Wallace knew that Jack complained about someone saying something unkind to him in SSR, someone sitting in his lap, two students making comments about his weight, hair and the technology club and someone saying something unkind to him on Facebook. All of these issues were addressed promptly when they were reported., and they did not happen again.

Most of the incidents Mr. Wallace was informed of undeniably had nothing to do with Jack's sex and all of them that were determined to be well-founded were addressed in some way. Plaintiffs claim here, however, appears to be that unkind treatment based on perceived sexual orientation was not taken sufficiently seriously, thus giving rise to liability. If that is Plaintiffs' theory, Mr. Wallace is entitled to qualified immunity as a matter of law.

22

In deciding whether qualified immunity bars Plaintiffs' claim, this Court must decide as a matter of law "(1) whether the facts alleged or shown by the Plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Estrada v. Rhode Island*, 594 F.3d 56, 62-63 (1st Cir. 2010) (quoting Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (alterations in original and internal citation omitted).  In order for a plaintiff to carry her burden of showing that every reasonable official should have known that the complained about action violated a constitutional or statutory right, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*

The First Circuit has stated that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful."  *Lopera v. Town Of Coventry*, 640 F.3d 388, 397 (1st Cir. 2011) (citing *Anderson*, 483 U.S. 635, 640 (1987) (holding that the lack of case law from the Supreme Court or First Circuit meant that the plaintiffs could not carry their burden to show that the law at the time was "clearly established")).  Furthermore, "even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169–70 (2d Cir. 2007); *see also Rocket Learning, Inc. v. Rivera-Sanchez*, 715 F.3d 1, 10 (1st Cir. 2013) (Secretary of Education was entitled to qualified immunity on an Equal Protection claim, regardless of whether there was an actual violation, because "[t]he record establishes that a reasonable official in the Secretary's position could have

23

rationally concluded that his actions were consistent with the Constitution.").

In this case, therefore, in order to assess whether Mr. Wallace is entitled to qualified immunity, the Court must first examine whether, when Jack was at BJHS, it was clearly established that same sex harassment of the type Jack has alleged was covered under Title IX and if so, whether Walter Wallace's efforts to address Jack's complaints of such harassment was deliberately indifferent.

On the first issue, "[w]hen determining whether a constitutional right is clearly established, we look first to the decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeals." *Andrews v. Hickman Cnty., Tenn.*, 700 F.3d 845, 853 (6th Cir. 2012). Plaintiffs cannot point to any First Circuit or Supreme Court cases that establish that Mr. Wallace had a duty under federal law to treat any of the alleged bullying here under a heightened standard. As the First Circuit explained in *Higgins,* "in same-sex harassment cases as in all sexual harassment cases, the plaintiff 'must always prove that the conduct at issue was not merely tinged with offensive sexual connotations,' but in fact constituted discrimination 'because . . . of sex.'" 194 F.3d at 258 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75,81 (1998)); *see also Frazier,* 276 F.3d at 66. Courts addressing the same types of teasing alleged here have found the same language to be decidedly not based on sex. *See, e.g., Patterson* 724 F. Supp. 2d at 691 ("man-boobs" comment referred to weight and was not based on sex); *Morgan*, 138 F. Supp. 3d at 95 ("thunder thighs" name-calling was not teasing because of the student's sex); *see also Sanches*, 647 F.3d at165-66 (same sex harassment amounted to personal animus, not sexual harassment); *Wolfe,* 648 F.3d at 867 (anti-gay name calling and attacks on masculinity insufficient to meet Title IX standard); *HB v. Monroe Woodbury Cent. Sch. Dist.*, 2012 WL 4477552, at *17 (sexually charged comments insufficient to show plaintiff was harassed because of her gender);

24

*Rodriguez v. Alpha Inst. of S. Fl.*, 2011 WL 5103950 (S.D. Fla., Oct. 27, 2011) (comments about sexual orientation not covered under Title IX); *Brodsky*, 2009 WL 230708, at *1 (use of sexually charged names was not "based on sex;" rather the name-calling stemmed from general hostility between students).

The law in this area – and indeed the definition of what types of conduct will be considered by a court to be "because of sex" – is evolving and it has been, and continues to be, far from clear.  What is clear, however, is that at least during the period when Jack was at BJHS, school personnel were being told that harassment based on sexual orientation was not covered under Title IX.  Thus, for example, "Sexual Harassment–It's Not Academic,"[9] guidance issued specifically for school personnel by the U.S. Department of Education Office of Civil Rights specifically states that "Title IX does not address discrimination or other issues related to sexual orientation."  *Id.* at p. 8.  The publication then goes on to provide in an example that students heckling another student with comments based on the student's sexual orientation but not sexual in nature are not covered by Title IX.  *Id.*

Nor is there any evidence that Mr. Wallace acted with deliberate indifference to Jack's rights.  To the contrary, the undisputed record establishes that Mr. Wallace was committed to stopping bullying in his school and instituted state of the art processes and procedures at BJHS to combat bullying.  Experts recommend that in order to decrease bullying, schools take steps to create strong bonds between staff and students and that is what Mr. Wallace did.  Experts recommend that in order to decrease bullying, schools provide predicable and escalating consequences for aggressive behavior, and that is what Mr. Wallace did by, among other things, instituting with the Peer to Peer Rubric.  Experts recommend that in order to decrease bullying,

---

[9] *Available at* http://www2.ed.gov/about/offices/list/ocr/docs/ocrshpam.html.

schools take steps to help teach aggressive youth to change and support targets, and that is what Mr. Wallace did.[10]   Based on all of his anti-bullying initiatives as well as the fact that he addressed Jack's issues as they arose, Mr. Wallace did not act with deliberate indifference as a matter of law and he is therefore entitled to summary judgment on Count II of Plaintiff's Complaint.

### B.   Brunswick School Department

In the absence of a discriminatory policy or wide-spread discriminatory practice, the School Department cannot be held liable under 42 U.S.C. § 1983 for the conduct of its employees.   The First Circuit has set forth that:

> [i]n an action pursuant to 42 U.S.C. § 1983, there can be no municipal liability under a respondeat superior theory.   *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690-95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).   Rather, to establish liability against the City, [the plaintiff] must prove deprivation of a constitutional right by means of 'the execution of the government's policy or custom.'

*Fabiano v. Hopkins*, 358 F.3d 447, 452 (1st Cir. 2003) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)).   In *Fabiano*, the court held that the plaintiff city employee failed to establish liability against the city where there was no evidence of a discriminatory policy or well-settled practice that resulted in the employee's termination.   *Id.*; *see also Bennett v. City of Biddeford*, 364 F. Supp. 2d 1, 3 (D. Me. 2005) ("Without any evidence of a municipal policy or custom, Plaintiff cannot maintain a cause of action against a municipality under section 1983."). This limitation on municipal liability applies equally to school districts.   *Dunham v. Crosby*, 435 F.2d 1177, 1179-80 (1st Cir. 1970) (holding that school board cannot be liable for actions of superintendent in 1983 action, "which seem[s] to contemplate only the liability of persons who have actually abused their positions of authority.").

---

[10] *See, e.g.* Olweaus, D., *Bullying at School: What We Know and What We Can Do* (1993*);* Davis, Stan, *Schools Where Everyone Belongs* (2007)

An isolated decision by an employee "constitutes official policy 'only where the decisionmaker possesses final authority to establish [school] policy with respect to the action ordered.'" *Freeman v. Town of Hudson*, 714 F.3d 29, 38 (1st Cir. 2013) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)); *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997) (quoting *Monell* at 694) ("The plaintiff must also demonstrate that through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."). In *Freeman*, the First Circuit upheld dismissal of claims against the town where the plaintiffs cited no laws establishing the policymaking authority of any individuals and alleged no acts that could be "properly attributable" to the town. *Freeman*, 714 F.3d at 38. The court concluded that the complaint failed to state more than a respondeat superior theory of liability insufficient to support a section 1983 action. *Id.*

Here, Plaintiffs do not allege that BSD had any official policy or a practice that is illegal or unconstitutional. Rather, they claim that the School Department is liable because Mr. Wallace "was the final policymaker for the School Department regarding the policies applied to Jack Doe at issue in this case." Complaint ¶ 98. The determination of whether a school principal has final policymaking authority is a question of state law to be decided by the Court, not a question of fact for the jury to resolve and this is thus an issue properly decided on summary judgment. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). In this case, as a matter of state law, only the BSD School Board has the authority to adopt policy. *See* 20-A M.R.S. § 1001 (1-A). Under Maine law, a school principal is not authorized to adopt or make policy. The Brunswick School Department is thus entitled to summary judgment on Count I of the Complaint.

III.   **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FIRST AMENDMENT RETALIATION CLAIM**

"In order to plead a retaliation claim under the First Amendment, a plaintiff must allege:

(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his or her constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *S.K. v. N. Allegheny Sch. Dist.*, 2016 WL 806483, at *12 (W.D. Penn. March 2, 2016) (citation omitted).  Here, there is no record evidence that would allow a jury to find that Defendants retaliated against Jack for engaging in any protected activity.  To the contrary, the record demonstrates that Defendants responded appropriately to the complaints Jack reported.  Indeed, Defendants continued to support Jack despite the fact that a number of his complaints were determined to be unfounded. Although Plaintiffs appear to be basing their retaliation claim on a note from one of Jack's teachers regarding Jack's failure to follow a safety plan, the record is clear that even when Jack chose to disregard the safety plan BJHS put in place for him, he never suffered any "consequences," and BJHS continued to support him appropriately.  SMF ¶¶ 179-80.  There is simply no evidence that Defendants ever took any action with any intent to punish Jack for making complaints, or to deter him from making further complaints.  *Id.* at *13.

## IV.     JANE DOE'S CLAIMS ON HER OWN BEHALF SHOULD BE DISMISSED

Finally, there are no facts in the record that give rise to any claim by Jane Doe on her own behalf.  Jane Doe was not ever a student at BJHS, so she has no claim personally under Title IX.  *Lopez v. Regents of Univ. of California*, 5 F. Supp. 3d 1106, 1114 (N.D. Cal. 2013) ("[I]n general, non-students such as parents do not have a personal claim under Title IX.").   For the same reason, she also has no claim under the MHRA.  *See, e.g., Helwig,* 2012 WL 1521474 (applying same standard to Title IX and MHRA claim).  Further, the record contains no facts indicating that Defendants ever violated Jane Doe's constitutional rights.  She was not harassed, and Defendants never took any adverse action against her for raising her concerns about the alleged mistreatment of Jack Doe by other students.  Accordingly, all of Jane Doe's claims on

her own behalf should be dismissed.

## **CONCLUSION**

The Plaintiffs are trying to transform Title IX  into an anti-bullying law which is precisely what the court in *Brodsky v. Trumbull Bd. of Educ.* has held that it is not.  2009 WL 230708, at *7.  The record evidence makes clear that the incidents of alleged harassment that Jack Doe actually reported, although unfortunate and sometimes unkind, were nothing more than typical middle school games and teasing.  Nothing in the record indicates that any of these incidents were instigated on the basis of Jack's sex.  The record is also clear that Mr. Wallace and the School Department responded appropriately to Jack's reports and were not deliberately indifferent to any known acts of harassment based on Jack's sex.  In short, the "limited circumstances" under which a school may be liable under Title IX are not present here. Furthermore, there is no record evidence to support the claims that Plaintiffs' constitutional rights were violated in any way.  Accordingly, this Court should grant Defendants' motion for summary judgment in its entirely.


DATED:  August 15, 2016                    */s/ Melissa A. Hewey*
                                          Melissa A. Hewey
                                          Michael L. Buescher
                                          Drummond Woodsum
                                          84 Marginal Way, Ste. 600
                                          Portland, ME  04101
                                          (207) 772-1941
                                          mhewey@dwmlaw.com
                                          mlbuescher@dwmlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2016, I electronically filed the above Motion for Summary Judgment with the Clerk of the Court using the CM/ECF system, which will send notification of such filings to all counsel of record.

*/s/ Melissa A. Hewey*
Melissa A. Hewey